431 F.2d 1046
 UNITED STATES STEEL CORPORATION, Plaintiff, and
National Steel Corporation, Republic Steel Corporation, Wheeling-Pittsburgh Steel Corporation, Bethlehem Steel Corporation, Jones & Laughlin Steel Corporation and Youngstown Sheet & Tube Company, Intervening Plaintiffs,
v.
FRATERNAL ASSOCIATION OF STEELHAULERS a/k/a Fraternal Association of Special Haulers, William J. Hill. National Chairman, Fraternal Association of Steelhaulers of Western Pennsylvania, William J. Hill, Chairman, Milton E. Schaudt, Executive Vice-President, David Haugh, Secretary, R. H. Wilson, Robert W. Schwirian, Clyde Mostoller, Harry Ludwig, and E. E. Stoner, Individually and as members of a class representing owners of steel hauling rigs, Appellants.
 No. 18910.
 United States Court of Appeals, Third Circuit.
 Argued June 25, 1970.
 Decided September 17, 1970.
 
 John J. Kirk, Kirk & Botula, Pittsburgh, Pa., for appellants.
 Leonard L. Scheinholtz, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellees.
 Before WINTER,* ALDISERT and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 At issue here is the propriety of a preliminary injunction entered by the district court enjoining appellants from "picketing or patrolling highways for the purpose of interfering with, or obor delaying any equipment belonging to the [appellees] or their customers, or those serving either the [appellees] or their customers."
 
 
 2
 The individual appellants are owners of specially equipped tractor-trailers commonly referred to as steel hauling rigs. The organizational appellants generally known as the Fraternal Association of Steel Haulers (FASH), are associations whose members are owners and drivers of the rigs. Some owners drive their own equipment; others, called fleet owners, do not. The owners-operators and fleet owners lease their equipment and furnish drivers to the common carriers of steel products who are certified by federal or state regulatory bodies, and for this service they receive a percentage of the gross revenue of the carrier.[1]
 
 
 3
 Appellees are steel manufacturers who engage the certified carriers for the transportation of their products. The freight rates they pay are based on published tariffs approved by the Interstate Commerce Commission or, in the case of intrastate operations, by appropriate state regulatory agencies.
 
 
 4
 The confrontation between the parties was precipitated in April, 1970, when members of FASH decided to withdraw their rigs from service to the carriers. In addition, FASH members sought by concerted action to dissuade other truckers from supplying service to and from appellees' mills and plants. FASH contended that the withdrawal of services resulted from its disaffection with the Teamsters Union which had represented a majority of its members in past negotiations with the carriers. Appellees, however, insist that FASH's actions were designed to force the steel producers to pay higher tariffs to the carriers, thus increasing the proportionate share of FASH members.
 
 
 5
 Following the withdrawal of rigs in April, 1970, FASH established marshalling areas throughout Western Pennsylvania where other steel haulers were invited by FASH members to pull off the highway and participate in discussions. In many instances, these invitations resulted in shootings, arson, rock throwing, tire slashing, and other assorted acts of wanton vandalism.
 
 
 6
 This then was the background that precipitated the filing of the complaint for injunctive relief. The companies charged that the individual appellants and FASH combined and conspired to restrain interstate commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2 and Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. A. §§ 15, 22 and 26. In opposing the request for the injunction, appellants argued that they are trade unionists and, accordingly, come within the anti-injunction protection of § 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113 (c).
 
 
 7
 The testimony disclosed a concerted and successful effort to withdraw services from appellees, an effort etched in violence. A Pennsylvania state police lieutenant testified that from April 6 to the day of his testimony, May 4, 1970, there were 566 reported incidents of trucking violence in Western Pennsylvania. From its review of the testimony, the district court concluded that FASH members were substantially responsible for this violence.
 
 
 8
 The district court further found that the individual appellants, as owners of their own rigs and fleets, were businessmen[2] who, through the concerted action of FASH and its related organizations, had illegally interfered with and disrupted the free flow of commerce and constituted an unlawful restraint of trade in violation of the Sherman and Clayton Acts. In so concluding, the court rejected appellants' primary contention that they are a labor organization exempt from the anti-trust laws and within the Norris-LaGuardia anti-injunction umbrella. On this issue this appeal must turn, for appellants concede, as they must, that their activities directed against the steel companies can only be validated if viewed as a legitimate exercise of labor's acknowledged right to withhold its services. There can be no doubt that the activities described herein — a boycott designed to interfere with the free play of market forces — would be an illegal restraint of trade if engaged in by non-labor groups. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Thus, if the district court was justified in concluding that appellants are not a labor group, the issuance of a preliminary injunction must be affirmed.
 
 
 9
 Moreover, it is essential to emphasize that this appeal involves only a review of a preliminary determination by the district court, dictated by the trial judge's finding that appellees established a reasonable probability of success at final hearing coupled with a demonstration of irreparable harm absent preliminary relief. We stress the preliminary nature of these findings because we detect a tendency on the part of appellants to add to these proceedings an aura of finality which simply is not present. This court has consistently confined its review of preliminary injunctions to the narrow question whether the grant or denial of the injunction was an abuse of discretion. Allis-Chalmers Mfg. Co. v. White Consol. Indus., 414 F.2d 506 (3 Cir. 1969); Bieski v. Eastern Automobile Forwarding Co., 354 F.2d 414 (3 Cir. 1965). As Judge Biggs noted in United States v. Ingersoll-Rand Co., 320 F.2d 509, 523 (3 Cir. 1963):
 
 
 10
 We start, of course, with the fundamental proposition that the issuance of an interlocutory injunction rests within the sound discretion of the trial court and that its discretion may not be interfered with on appeal unless it has been exercised improvidently.
 
 
 11
 This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district judge; only a clear abuse of his discretion will justify appellate reversal.
 
 
 12
 In the case before us appellants do not seriously question the district court's determination that appellees would have sustained irreparable injury in the absence of preliminary relief. Rather, it is their contention that FASH's status as a labor group is so apparent that the use of injunctive sanctions against them was an obvious abuse of discretion. Upon review of the present record we encounter no little difficulty in discerning the patency of its status as a labor organization. William J. Hill, president of FASH and appellants' principal witness in the proceedings below, was quite candid in describing FASH as a "businessman's organization" in a taped television interview introduced into evidence. And during direct testimony, Hill indicated that one of the prime reasons for the formation of FASH was that "every time the Teamsters come along with a raise for us, it goes to the driver. It does not go to the truck."[3]
 
 
 13
 Emerson E. Stoner, a fleet owner of five rigs, also characterized himself as a businessman and offered the observation: "I have never had representation as a fleet owner, and I feel that this organization [FASH] will give us some support, will look to the owner operator and to the fleet operator with respect to whether or not he can make a dollar."
 
 
 14
 From the foregoing, and based on a thorough examination of this entire record, we are unable to say that the district court clearly erred when it concluded that FASH's confrontation with appellees was not a labor dispute within the meaning of the Norris-LaGuardia Act.
 
 
 15
 Appellants argue, however, that despite the factual determination made by the district court on the basis of the testimony at the hearing, their status as a labor organization is already judicially established and should have been so recognized by the district court as a matter of law. Primary reliance for this position is placed on the Supreme Court's decisions in Local 24, International Teamsters, etc., Union v. Oliver, 358 U. S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959) (Oliver I) and American Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968). We perceive substantial distinctions between the issues presented in Oliver I and Carroll and the case at bar.
 
 
 16
 In Oliver I a group of Ohio trucking unions negotiated a collective bargaining agreement with interstate motor carriers which prescribed both a wage scale for drivers and a minimum rental for the truck when it was operated by its owner. The Ohio courts permanently enjoined implementation of the minimum rental provision as violative of the state's anti-trust laws forbidding pricing agreements. The United States Supreme Court reversed, holding that the minimum rental provision was a legitimate product of collective bargaining under the Labor Management Relations Act, 29 U.S.C. §§ 157, 158, and that state laws could not preempt the proper exercise of federal rights. The Court was extremely careful, however, to confine its holding to a "narrowly restricted application to the times when the owner drives his leased vehicle for the carrier,[4] and to the adverse effects upon the negotiated wage scale which might result when the rental for the use of the leased vehicle was unregulated at these times." 358 U.S. at 293, 79 S.Ct. at 303. Thus, the controversy in Oliver I was recognized as a "labor dispute" because it essentially involved the preservation of a driver's wage. The economic interrelationship between the wage scale and a minimum rental for the owner-driver necessitated such a holding.[5]
 
 
 17
 In contrast, one of the prime motivations for FASH's activities has been to acquire representation for the fleet owner since "every time the Teamsters come along with a raise it goes to the driver. It does not go to the truck." This unmistakable concern with a return on capital investment, although economically understandable, lends a distinct non-labor character to FASH's operations. The basic factor present in Oliver I — maintenance of the integrity of the driver's basic wage scale — seems conspicuously absent here, at least on the present state of the record. Rather, what appears to be involved is the owner's demand for a more profitable operation of his equipment.
 
 
 18
 In Carroll, in which the Court relied on Oliver I, the question presented was "whether union practices * * * affecting orchestra leaders violate the Sherman Act as activities in combination with a `non-labor' group, or are exempted by the Norris-LaGuardia Act as activities affecting a `labor' group which is party to a `labor dispute'." 391 U.S. at 101, 88 S.Ct. at 1565. Noting that the union activities (price lists) were "justified as a means of preserving the scale of the sidemen and subleaders," id. at 111, 88 S.Ct. at 1570, and finding that the union did not attempt "by its minimum charge to assure the leader of a profit above the fair value of his labor services," id. at 110 n. 10, 88 S.Ct. at 1569 (emphasis supplied), the Court held that for the purposes of the questioned activities the leaders were a labor group involved in a labor dispute. In reaching this conclusion, the Court quoted Judge Friendly's concurring and dissenting opinion when the case was before the Second Circuit: "`A different result might be warranted if the floor were set so high as to cover not merely compensation for the additional services rendered by a leader but entreprenurial profits as well'." Id., quoting 372 F.2d 155, 170 (2 Cir. 1967).
 
 
 19
 We are not persuaded that Oliver I and Carroll can be justifiably extended to permit the successful invocation of the Norris-LaGuardia Act to protect activities designed to insure business profit or capital investment. On the basis of the record as it now stands, FASH has failed to demonstrate that its primary purpose was to protect the drivers' interest in the gross revenue rather than the owners' interest in the equipment rental.[6]
 
 
 20
 In sum, appellants had the burden of proving FASH to be a labor organization, thereby immunizing the organizational and individual appellants from an anti-trust injunction. We are satisfied that the district court did not abuse its discretion in holding that appellants failed to meet that burden.
 
 
 21
 The judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 *
 Circuit Judge of the Court of Appeals for the Fourth Circuit, sitting by designation
 
 
 [1]
 An owner-operator who leases his complete rig to the carrier receives 75% of the gross revenue paid by the steel producer to the carrier. Of the revenue received, the owner-operator allocates 26% for the services of the driver, and the remaining 49% is allocated for the cost of equipment rental. From this 49% the owner must pay the monthly finance charges for his rig, insurance, maintenance, and overhead expenses. Whatever remains is profit to him
 
 
 [2]
 Appellants conceded at oral argument that this was a finding of fact. See Fed. Civ.Pro.Rule 52(a) for review standard
 
 
 [3]
 The television interview produced the following exchange:
 Q. How many are in your group now?
 A. We are approaching ten thousand in the Fraternal Association of Steel-haulers, which is actually, more or less, a businessman's organization.
 Q. You are businessmen in the sense that you own your own trucks and you drive them as well.
 A. This, basically, is the big problem. We're a two-headed individual, let's say. On the one side, we are a truck driver, on the other side we are a businessman. * * *
 Q. What is there about the Teamsters' contract, covering all drivers, that you don't like? In what special way doesn't it represent what you think you need.
 A. Well, number one, we don't agree with the percentage they have set up for us.
 Q. Which percentage is this?
 A. * * * We work under 75% of the revenue — if the company makes a dollar, we get seventy-five cents of that dollar.
 Q. Seventy-five cents on the dollar! That's a pretty good percentage.
 A. Right. That's a pretty good percentage, but let's not forget, we have equipment investments up to twenty-, twenty-five thousand dollars. Our truck payments per month, uh, the majority of our people pay five to six hundred dollars a month for a piece of equipment, and every time the Teamsters come along with a raise for us, it goes to the driver. It does not go to the truck. And, let's face it, it's an economical situation.
 Q. Well, during inflationary periods, it costs more and more and more to maintain your trucks.
 A. The prices of our equipment has been rising, the prices of getting the equipment repaired has been on the increase.
 During direct examination, the following colloquy occurred:
 Q. Now, then, is it fair to say that in the intervening two years between the time that FASH was organized, both the local chapter and in the national organization, that you and your members have become increasingly dissatisfied with the Teamsters' representation of you as owners of the leased rigs and that you eventually came to the conclusion that the owners of leased vehicles had to deal separately with the carriers — by that, I mean separate and apart from the Teamsters' Union — if you were to adequately protect your investment and your equipment?
 A. Owners and drivers. As owners and drivers.
 * * * * *
 Q. So that was one of the reasons, was it not, for the decision of FASH and its members to seek to pull out of the Teamsters' Union?
 A. That would be one of several reasons.
 
 
 [4]
 This same factor distinguishes this court's holding in Steel City Transport, Inc. v. N. L. R. B., 389 F.2d 735 (3 Cir. 1968), where we were also concerned only with the "single owner-operator."
 
 
 [5]
 It should also be noted that inOliver I no claim was made that the collective bargaining agreement between the truckers and the carriers violated any federal anti-trust legislation. Thus, once it was decided that the agreement came within the scope of the L.M.R.A., the doctrine of federal preemption barred application of the state's anti-trust law.
 
 
 [6]
 It is significant that in bothOliver I and Carroll the Court was reviewing the grant of a permanent injunction. Thus, in reaching its legal conclusions, the Court had before it a complete record rather than an abbreviated set of facts adduced at a preliminary stage of the proceedings.