UNITED STATES STEEL CORPORA-TION, Bethlehem Steel Corporation, Jones & Laughlin Steel Corporation, Wheeling-Pittsburgh Steel Corporation, National Steel Corporation, Republic Steel Corporation and Youngstown Sheet & Tube Company

v.

FRATERNAL ASSOCIATION OF STEEL HAULERS, a/k/a Fraternal Association of Special Haulers, William J. Hill, National Chairman; Fraternal Association of Steel Haulers of Western Pennsylvania, William J. Hill, Chairman, Milton E. Schaudt, Executive Vice President, David Haugh, Secretary, R. H. Wilson, Robert W. Schwirian, Clyde Mostoller, Harry Ludwig, E. E. Stoner and Paul Burns, Individually and as members of a class representing owners of steel hauling rigs, Appellants in No. 79–1055.

UNITED STATES STEEL CORPORA-TION, Bethlehem Steel Corporation, Jones & Laughlin Steel Corporation, Wheeling-Pittsburgh Steel Corporation, National Steel Corporation, Republic Steel Corporation and Youngstown Sheet & Tube Company, Intervening Plaintiffs, Appellants in No. 79–1145,

v.

FRATERNAL ASSOCIATION OF STEEL HAULERS, a/k/a Fraternal Association of Special Haulers, William J. Hill, National Chairman; Fraternal Association of Steel Haulers of Western Pennsylvania, William J. Hill, Chairman, Milton E. Schaudt, Executive Vice President, David Haugh, Secretary, R. H. Wilson, Robert W. Schwirian, Clyde Mostoller, Harry Ludwig, E. E. Stoner and Paul Burns, Individually and as members of a class representing owners of steel hauling rigs.

UNITED STATES STEEL CORPORA-TION, Bethlehem Steel Corporation, Jones & Laughlin Steel Corporation, Wheeling-Pittsburgh Steel Corporation, National Steel Corporation, Republic

Steel Corporation and Youngstown Sheet & Tube Company, Intervening Plaintiffs,

v.

FRATERNAL ASSOCIATION OF STEEL HAULERS, a/k/a Fraternal Association of Special Haulers, William J. Hill, National Chairman; Fraternal Association of Steel Haulers of Western Pennsylvania, William J. Hill, Chairman, Milton E. Schaudt, Executive Vice President, David Haugh, Secretary, R. H. Wilson, Robert W. Schwirian, Clyde Mostoller, Harry Ludwig, E. E. Stoner and Paul Burns, Individually and as members of a class representing owners of steel hauling rigs, Appellants in No. 79–1168.

Nos. 79–1055, 79–1145 and 79–1168.

United States Court of Appeals, Third Circuit.

Argued June 5, 1979.

Decided July 10, 1979.

Paul D. Boas (argued), Berlin, Boas, Isaacson, Logan & Sharon, Pittsburgh, Michael J. Healey, Pittsburgh, Pa., Thomas M. Kerr, Jon G. Hogue, Titus & Marcus, Pittsburgh, Pa., for appellants, FASH, et al.

Leonard L. Scheinholtz (argued), Daniel I. Booker, Stephen J. Stabler, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for United States Steel Corp., Bethlehem Steel Corp., Jones & Laughlin Steel Corp., Wheeling-Pittsburgh Steel Corp. and Youngstown Sheet & Tube Co.

Clyde W. Armstrong, Richard I. Thomas, Thorp, Reed & Armstrong, Pittsburgh, Pa., for National Steel Corp. and Republic Steel Corp.

Before ALDISERT, VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

These appeals emanate from a permanent injunction entered by consent in 1971, which enjoined the appellants from interfering with, obstructing or delaying any equipment belonging to appellee steel manufacturers, their customers, or to those serving them. The appellants were specifically enjoined from violating any prohibitions contained in any Act of Congress, particularly the Sherman and Clayton Acts. We must decide whether the district court's adjudications of contempt are appealable

and whether the court misused its discretion in refusing to dissolve the 1971 permanent injunction. Appellees have cross appealed, contending that the court erred in modifying the injunction to exempt certain members of FASH from its terms. We hold that the findings of contempt are not appealable, that the court correctly refused to dissolve the injunction, and that it was error to modify the injunction.

The individual appellants at Nos. 79–1055 and 79–1168 are owners of specially equipped tractor-trailers commonly referred to as steel hauling rigs. The organizational appellants, generally known as the Fraternal Association of Steel Haulers (FASH), are associations whose members are owners and drivers of rigs. Some owners drive their own equipment; others, called fleet owners, do not. The owner-operators and fleet owners lease their equipment and furnish drivers to the common carriers of steel products who are certified by federal or state regulatory bodies, and for this service they receive a percentage of the gross revenue of the carrier.

The appellees, cross-appellants in No. 79–1145, are steel manufacturers who engage the certified carriers for the transportation of their products. The freight rates they pay are based on published tariffs approved by the Interstate Commerce Commission or, in intrastate operations, by the appropriate state regulatory agencies.[1]

The permanent injunction dated September 10, 1971 was entered by consent and is identical in all material respects to a preliminary injunction entered by the district court on May 15, 1970, which we reviewed in *United States Steel Corp. v. Fraternal Association of Steelhaulers*, 431 F.2d 1046 (3d Cir. 1970).

FASH is more than one organization. Described by the district court as "a 'siamese' triplet of three separate yet combined entities,"[2] it is first a national federation of associations formed to promote "the mutual protection and advancement of the interests and general welfare of independent tractor-trailer owner-operators, drivers, and allied occupations in the general business of hauling and transporting steel and steel products." App. at 2289a–1. In addition, the term FASH may refer to the Fraternal Association of Steel Haulers of Western Pennsylvania, chartered as a Pennsylvania not-for-profit corporation in 1968, for the purpose of promoting the "desires of persons connected with the steel hauling industry whether such persons be owners of vehicles, drivers of vehicles, or owner-operators." *Id.* at 2282a. A third facet of FASH is the Fraternal Association of Special Haulers (Special Haulers), described by William J. Hill, President and Chairman of all the defendant associations, as "the union part of FASH." *Id.* at 2294a–32. By the time the permanent injunction was entered in 1971, Special Haulers had entered into two collective bargaining agreements with common carriers and had been certified by the National Labor Relations Board as a collective bargaining representative for employees of Tryon Trucking Company. Since then, Special Haulers has entered into collective bargaining agreements with two or three additional carriers.

The factual background which led to the 1970 preliminary injunction and the consent 1971 permanent injunction has been previously summarized by this court:

The confrontation between the parties was precipitated in April, 1970, when members of FASH decided to withdraw their rigs from service to the carriers. In

1. The characterization of the parties is taken from an opinion on a previous aspect of this dispute before us in *United States Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1047 n.1 (3d Cir. 1970):

An owner-operator who leases his complete rig to the carrier receives 75% of the gross revenue paid by the steel producer to the carrier. Of the revenue received, the

owner-operator allocates 26% for the services of the driver, and the remaining 49% is allocated for the cost of equipment rental. From this 49% the owner must pay the monthly finance charges for his rig, insurance, maintenance, and overhead expenses. Whatever remains is profit to him.

2. Appendix at 2789a.

addition, FASH members sought by concerted action to dissuade other truckers from supplying service to and from appellees' mills and plants. FASH contended that the withdrawal of services resulted from its disaffection with the Teamsters Union which had represented a majority of its members in past negotiations with the carriers. Appellees, however, insist that FASH's actions were designed to force the steel producers to pay higher tariffs to the carriers, thus increasing the proportionate share of FASH members.

Following the withdrawal of rigs in April, 1970, FASH established marshalling areas throughout Western Pennsylvania where other steel haulers were invited by FASH members to pull off the highway and participate in discussions. In many instances, these invitations resulted in shootings, arson, rock throwing, tire slashing, and other assorted acts of wanton vandalism.

This then was the background that precipitated the filing of the complaint for injunctive relief. The companies charged that the individual appellants and FASH combined and conspired to restrain interstate commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2 and Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15, 22 and 26. In opposing the request for the injunction, appellants argued that they are trade unionists and, accordingly, come within the anti-injunction protection of § 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113(c).

431 F.2d at 1047.

A second massive withdrawal of these rigs from service in a campaign sponsored by FASH, this time in 1978, precipitated the present proceedings. The FASH National Committee decided on July 29, 1978 to organize a shutdown of steel hauling rigs. Thereafter President Hill and other national officers traveled throughout steel producing areas from Chicago to Philadelphia to promote the shutdown which eventually began on November 10–11, 1978 and substantially cut shipments at the appellees' mills. For one company alone, some $67 million of

steel product shipments sat unshipped after twenty days of the shutdown. App. at 2407a.

As in 1970, the withdrawal was accompanied by many acts of violence and vandalism. Testimony by Major Homer Redd of the Pennsylvania State Police established that there were 260 incidents of trucking violence on Pennsylvania highways during the first month of the shutdown, including rock-throwing, shootings, threats, and tire and air hose slashings. The officer also testified that there are very few incidents involving trucks during normal times. *Id.* at 555a–56a.

In a radio interview on November 1, 1978, President Hill summarized the goals of his association:

> We would like to get every steel hauler in the nation into our organization whether you call it a trade association, you could call it a union, whatever you want. . . . [W]hen I talk about price, that's charging the mills what they're going to haul steel for and *our people are the people with capital investments, they are the people that have investment and responsibility for their equipment.* They are people who have to maintain that equipment. But they have nothing to say on what a load of steel will be hauled for, the price a load of steel will be hauled for from here to Chicago. It's the middleman, the broker, the guys that have a certificate with the ICC that have no capital investment that is saying we'll charge you 10 cents per hundred weight to haul this load of steel.

*Id.* at 2291a–1 (emphasis added).

The shutdown continued until appellees returned to the district court asking that the appellants be held in contempt of the 1971 consent injunction. At the same time appellants sought to have the terms of the injunction modified under Fed.R.Civ.P. 60(b). After an evidentiary hearing on the various motions, the district court found that FASH intentionally contravened the 1971 order without first seeking proper modification of it and concluded that FASH

attempted to circumvent the judicial process by organizing and conducting the shutdown notwithstanding the prohibition of the 1971 order. The court adjudged that FASH and nineteen named individuals were in contempt, and as to each individual, it outlined the specific evidence supporting its adjudication. *Id.* at 2805a–07a, 2741a–59a.

The court also dealt with the principal defense raised by FASH, that is, that it is a labor organization engaged in a dispute concerning wages, hours and working conditions and is consequently exempt from the antitrust laws upon which the injunction was based. On this question, the district court concluded that the evidence before it was substantially the same as in 1970—that FASH members considered themselves to be and are businessmen who sought collectively to negotiate their own rates and cover their costs of operation. E.g. *id.* at 2792a–93a, 2797a. It also found that FASH aimed its activities directly at steel manufacturers. *Id.* at 2801a–02a. Based on these findings, the court denied appellants' motion to vacate or dissolve the injunction and adjudged FASH and the nineteen individuals in contempt.

■ A combination of businessmen illegally restraining trade offends the antitrust laws of the United States. FASH failed in its efforts to skirt the sanctions of these laws in 1970 because it could not prove, first, that it was solely a labor organization, and, equally important, that it was a labor organization which did not combine with businessmen to restrain trade. *Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). *See* discussion in *United States Steel Corp. v. Fraternal Association of Steelhaulers*, 431 F.2d 1046 (3d Cir. 1970).

By amended order of January 22, 1979, the district court found that the FASH shutdown had ended and that FASH and its officers and members had purged themselves of their contempt of the 1971 injunction. App. at 2819a–20a.

## I.

■ We address first the appeal in No. 79–1168 from the adjudication of contempt. As previously stated, the district court imposed no penalties, and by order of January 22, 1979 specifically found that FASH, its officers and members, had purged themselves of their contempt. It is generally held that, although a sentence for civil contempt may be immediately appealable, until a sentence or sanction has been imposed "the situation is lacking in the elements of operativeness and consequence necessary to be possessed by any judicial order to enable it to have the status of a final decision under § 1291." *S.E.C. v. Naftalin*, 460 F.2d 471, 475 (8th Cir. 1972), *citing* 9 J. Moore, Federal Practice § 110.13[4]. *See also American Saint Gobain Corp. v. Armstrong Glass Co.*, 418 F.2d 571 (6th Cir. 1969); *International Silver Co. v. Oneida Community, Ltd.*, 93 F.2d 437, 440–41 (2d Cir. 1937). A distinction is made, for appealability purposes, between criminal contempt proceedings which have for their purpose the vindication of the dignity and authority of the court, and civil contempt proceedings which are intended to enforce the rights of private parties, to compel obedience to orders and decrees made to enforce their rights and to give them a remedy to which the court deems them entitled. *Doyle v. London Guarantee Co.*, 204 U.S. 599, 604–05, 27 S.Ct. 313, 51 L.Ed. 641 (1907). Civil contempt becomes appealable only when the contemnor has refused to comply with the remedial order and the court has exercised its authority either to punish or to coerce compliance. *Alexander v. United States*, 201 U.S. 117, 121–22, 26 S.Ct. 356, 50 L.Ed. 686 (1906). Accordingly, inasmuch as the court imposed no punitive or coercive order, but in fact determined that the contemnors had purged themselves, we hold that the adjudication of contempt was interlocutory only. We shall dismiss the appeal for lack of jurisdiction for want of a final order.

## II.

■ Appellants next contend in No. 79–1145 that the district court erred in fail-

ing to modify the terms of the 1971 injunction pursuant to a motion to modify duly filed under Fed.R.Civ.P. 60(b). We find no merit to this contention.

Rule 60(b) provides that "[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from operation of the judgment." While the language of either provision is broad, neither presents the court with a "standardless residual discretionary power to set aside judgments. . . . " *Mayberry v. Maroney*, 529 F.2d 332, 337 (3d Cir. 1976) (Gibbons, J., concurring). Instead it is settled that such relief is extraordinary and may be granted only upon a showing of "exceptional circumstances."

*Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977) (*Maroney II* ). We also recognize that while consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *see United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). And when, as in this case, the appellants made a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment, their burden under Rule 60(b) is perhaps even more formidable than had they litigated and lost. *See Vecchione v. Wohlgemuth*, 558 F.2d 150 (3d Cir.), *cert. denied*, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977). Although the court has the power to modify a consent decree, *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 76 L.Ed. 999 (1932), a party seeking Rule 60(b) relief bears a heavy burden of showing circumstances so changed that "dangers, once substantial, have become attenuated to a shadow." *Id.* at 119, 52 S.Ct. at 464; *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119 (3d Cir. 1979).

FASH argues that it has demonstrated "exceptional circumstances" and relies on certain evidence to support its claim that the court erred in refusing to modify the 1971 injunction. It contends that Special Haulers, the self-styled "union" arm of the organization, has a few collective bargaining agreements with carriers and has been certified as a bargaining agent in several cases before the NLRB. But Special Haulers had collective bargaining agreements and one NLRB certification before it consented to entry of the injunction in 1971. App. at 1747a, 1756a–57a. It next contends that many of its members are covered by a collective bargaining agreement of the International Brotherhood of Teamsters, and that this contract regulates various aspects of the relationship between Teamster contract carriers and owner-operators. FASH Brief at 26–31. The deficiency in this argument is that FASH has not shown those provisions to be different from those that were in effect in 1970 and 1971.

Moreover, because many of the vital trial court determinations were factual in nature and are governed on review by the clearly erroneous standard of Fed.R.Civ.P. 52, FASH must reckon with the finding by the district court, critically adverse to its theory, that although

FASH officials and their counsel maintain and urge that the labor relationship exists now differently from what it was in 1970 and 1971, the evidence throughout the hearing pointed conspicuously to the attitude of the defendants and many of those who testified to the effect that they were businessmen.

App. at 2797a. The court further found that FASH members "invest capital in a business venture." *Id.* at 2801a. Our own independent review of the record does not persuade us that these findings are "completely devoid of minimum evidentiary support displaying some hue of credibility" or that they bear "no rational relationship to the supportive evidentiary data," *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972).

When this case was previously before us we discussed *Local 24, International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959) (*Oliver I*), and *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), and perceived "substantial distinctions between the issues presented in *Oliver I* and *Carroll* and the case at bar." 431 F.2d at 1049. We said then, "On the basis of the record as it now stands, FASH has failed to demonstrate that its primary purpose was to protect the drivers' interest in the gross revenue rather than the owners' interest in the equipment rental." *Id.* at 1050–51. After we remanded the proceedings in 1970, the record was not augmented prior to the entry of the permanent injunction. Faced with an even more onerous burden in the 1978 hearings, because it was now proceeding as movant in a Rule 60(b) proceeding rather than as a mere defendant in an ongoing equity action, FASH, through National President Hill, failed to help its cause on this issue. As indicated heretofore, Hill emphasized that "our people are the people with capital investments, they are the people that have investment and responsibility for their equipment." App. at 2291a. In a letter to the Small Business Administration, Hill referred to "independent truckers and *other* small businessmen who are facing bankruptcy due to the nations's increasing recession." *Id.* at 2295a (emphasis added).

■ We, therefore, do not find clearly erroneous the district court's rejection of the FASH contention that it had a "philosophical change" since 1970 and that it now represents principally drivers, not owners. FASH Brief at 11. The literature of FASH, its charter and bylaws, the out of court statements of its president and the other objective evidence do not convincingly demonstrate the purported change. Accordingly, we conclude that appellants failed to meet the heavy burden of proof that is required to merit the extraordinary relief that may be granted under Rule 60(b) only upon a showing of exceptional circumstances.

Nor has applicable law changed since 1970. Appellants' contention that *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), precludes injunctive relief on the theory that appellees were too remote from the effect of their work stoppage is now foreclosed by *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 594 (3d Cir. 1979).

## III.

■ The cross-appellants' contention is directed at the district court's *sua sponte* modification of the 1971 injunction to exclude certain FASH members from its terms. The effect of the modification is to make the injunction inapplicable to FASH members who drive for and lease their rigs to a carrier whose employees are represented by Special Haulers for collective bargaining purposes. We hold that there was insufficient evidence in the record to justify the court in granting the extraordinary relief under Rule 60(b).

The central issue is not whether the FASH members belonged to a union certified for collective bargaining purposes. Assuming that members of the Special Haulers faction of FASH were found not to be businessmen but rather legitimate union members, "[i]t is also beyond question that nothing in the anti-injunction provisions of the Norris-LaGuardia Act, nor in the labor exemption provisions of the Clayton Act, insulates a combination in illegal restraint of trade between businessmen and a labor union from the sanctions of the antitrust laws." *Los Angeles Meat Drivers Union v. United States*, 371 U.S. 94, 99–100, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962) (footnotes omitted).

Immunity from the strictures of the injunction for Special Haulers who had collective bargaining agreements could properly have been granted only to designated Special Haulers if they neither joined nor cooperated with the objectives of the other FASH members deemed by the court to be businessmen. Indeed our examination of the record persuades us that this could not have been shown. For example, the testi-

mony of President Hill was that the Special Haulers met in concert with the "businessmen" members of FASH, and there was evidence that even Special Haulers who had no-strike contracts with their carriers withdrew their rigs from service. Under these circumstances, even adopting the contention that these particular Special Hauler units were bona fide unions, and this is only an assumption, their participation in the work stoppage in concert with non-labor units brought them within the strictures of the antitrust laws. Accordingly, the district court erred in modifying the injunction.

## IV.

The appeal at No. 79–1168 will be dismissed for lack of an appealable order. The judgment of the district court will be affirmed in all respects except that the portion of the January 9, 1979 order which modified the consent injunction of 1971 will be vacated, and the 1971 decree reinstated in all respects.

Appellants will bear the costs in Nos. 79–1055 and 79–1168; appellees will bear the costs in the appeal at No. 79–1145.