# IN RE PETER NAJAWICZ, AMOS W. CARTY, JR., and RODNEY E. MILLER, SR.

S. Ct. Civ. No. 2009-001

Supreme Court of the Virgin Islands

September 22, 2009

311

312

313

314

317

CHARLES J. GRANT, ESQ., Grant & Lebowitz, LLC, Philadelphia, PA; WIL-
LIAM J. GLORE, ESQ., Dudley, Clark & Chan, L.L.P., St. Thomas, USVI,
*Attorneys for Appellant, Rodney E. Miller, Sr.*

WARREN B. COLE, ESQ., Hunter Cole & Bennett, St. Croix, USVI, *Attorney
for Appellants, Charles J. Grant, Esq. and William J. Glore, Esq.*

TIFFANY V. ROBINSON, ESQ., AAG, Dept. of Justice, St. Thomas, USVI,
*Attorney for Appellee, People of the V.I.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and HODGE,
Designated Justice.[1]

## OPINION OF THE COURT

(September 22, 2009)

HODGE, C.J. In this consolidated and expedited appeal, Appellants
Rodney E. Miller, Sr. ("Miller"), Charles J. Grant, Esquire ("Attorney
Grant"), and William J. Glore, Esquire ("Attorney Glore") challenge

---

[1] Associate Justice Ive Arlington Swan has been recused from this matter. Verne A.
Hodge, a retired Presiding Judge of the Superior Court, sits in his place by designation pur-
suant to 4 V.I.C. § 24(a).

several orders entered by the Superior Court. Specifically, Miller appeals from an August 5, 2008 temporary restraining order ("TRO"), a November 26, 2008 civil contempt order, and a November 18, 2008 preliminary injunction. Attorneys Grant and Glore appeal solely from the November 26, 2008 civil contempt order. For the reasons which follow, we will affirm the TRO and the preliminary injunction, but we will reverse the civil contempt order to the extent that order applies to Miller. Additionally, we will dismiss the appeal filed by Attorneys Grant and Glore for lack of jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This factually and procedurally complex appeal arises from Miller's employment as the Chief Executive Officer and President of the Roy Lester Schneider Hospital ("the hospital") during the period of May 14, 2002 to November 3, 2007. The events essential to this appeal commenced on August 5, 2008 when the People of the Virgin Islands ("the People") sought and obtained an *ex parte* TRO pursuant to V.I. CODE. ANN. tit. 14 § 606(h) of the Criminally Influenced and Corrupt Organizations Act ("CICO").[2] The *ex parte* TRO, which was placed under seal, ordered a sixty-day pre-trial restraint of various assets belonging to Miller, as well as assets owned by Peter Najawicz ("Najawicz") — the former Chief Financial Officer of the hospital — and Amos W. Carty, Jr. ("Carty") — the former General Counsel and Chief Operating Officer of the hospital.

The Superior Court judge who issued the TRO found probable cause, based upon an affidavit submitted by Special Investigator Nicholas Peru ("Peru") of the Inspector General's Office, to believe that the property restrained by the TRO would be subject to criminal forfeiture in the event of a conviction under CICO. The TRO states that it applies to the persons and assets named in the order and purports to restrain certain real properties and vehicles, as well as bank accounts located in the Virgin Islands, Florida, Virginia, and Illinois.[3] Miller's Florida home and his

---

[2] CICO is codified as 14 V.I.C. §§ 600-614 (1996).

[3] The TRO also reads:
 IT IS HEREBY ORDERED . . .

bank accounts located in Virginia and Florida were purportedly restrained by the TRO.[4]

After the TRO was issued, Pentagon Federal Credit Union ("PFCU"), a bank located in Virginia at which Miller has several accounts, was immediately provided with a faxed and certified copy of the TRO. Nevertheless, due to an admitted oversight on the bank's part, the bank did not apply the restraint until early September. In the meantime, the Virgin Islands Daily News ran a front-page article on August 8, 2008 reporting that a TRO had been issued that froze certain assets, including "bank accounts," owned by Miller, Najawicz, and Carty. (J.A. at 931.) The article did not specify which bank accounts were restrained by the TRO. On the same day the article was published, Miller, who resides in Florida, transferred $100,000 to his mother's bank account in Texas from one of his PFCU accounts. On August 18, 2008, Miller made two separate transfers from this account to his attorneys: $160,000 to the Pennsylvania bank account of Grant & Lebowitz, LLC and $150,000 to the Virgin Islands bank account of Dudley Clark & Chan, LLP. On August 21, 2008, Miller transferred an additional $75,000 to Dudley Clark & Chan as well as $15,000 to the bank account of Akerman Senterfitt & Eidson, P.A., a law firm with offices in Florida. On August 26, 2008, Miller transferred $50,000 to his wife's account at a different Virginia bank. Lastly, Miller transferred $650,000 to his wife's Virginia account on September 2, 2008.

---

. . . that neither the owner(s) of record nor any other person, or entity, may alienate, transfer, conceal, encumber, or dispose of any personal property stated herein, including but not limited to any monetary instrument, fund, obligation, or credit during the duration of this order.

Specifically, all bank account activities, including but not limited to the withdrawing or depositing of funds, are hereby suspended. The accountholders are not allowed to conduct any transaction on these accounts at the above-stated financial institutions . . . .

. . . .

IF YOU HAVE BEEN SERVED WITH THIS ORDER, YOU ARE HEREBY COMMANDED FORTHWITH to comply with this [TRO] by either recording, registering, attaching, or applying this order to the asset stated in this order, for the purpose of providing notice to any person who might inquire, and in some instances to freeze any asset stated in this order belonging to the persons stated in this order.

(J.A. at 59.)

[4] As Najawicz and Carty do not appeal from the trial court's orders, we address only those facts relevant to Miller.

321

In total, $1.2 million was transferred from PFCU during the month following the issuance of the *ex parte* TRO.

Shortly after entry of the TRO, Najawicz and Carty requested a hearing on the TRO, which was scheduled for August 18, 2008. At the hearing, Miller's attorney was present and entered an appearance but Miller was not present. During the hearing, the People entered into a stipulated agreement with respect to the restraint of Carty's assets, but, as no agreement was reached with respect to Najawicz's assets, the hearing was continued to August 22, 2008. On August 20, 2008, Miller filed a motion to vacate the TRO, arguing *inter alia* that the court lacked jurisdiction to restrain his extraterritorial assets and that Peru's affidavit lacked probable cause. At the August 22, 2008 hearing, the trial court heard arguments on the motions to vacate the TRO which were filed by Najawicz and Miller. Miller was present at the hearing and was represented by counsel.

During the weeks following the hearing but prior to the trial judge's decision on the motions to vacate, several modifications of the TRO were ordered. On September 4, 2008, the court entered a TRO adding restraints to the bank accounts belonging to Miller's mother and wife to which Miller had transferred funds from his PFCU account, as well as restraining accounts in the name of Najawicz and Carty located at PFCU. On September 12, 2008, the trial judge further amended the August 5, 2008 TRO by removing restraints from several properties in St. Thomas that were alleged by the People to be owned by Najawicz and Miller but no longer belonged to them, and from a bank account in Carty's name. On September 11, 2008, the court amended the September 4, 2008 TRO, refusing to restrain any other accounts in Miller's wife's name at PFCU, denying the People's request to restrain three additional accounts in the name of Najawicz and Carty, and reaffirming the restraint on the Virginia and Texas accounts belonging to Miller's wife and mother.

On September 5, 2008, the People filed a Motion to Show Cause why Miller should not be held in contempt for transferring funds from an account restrained by the August 5, 2008 TRO and why Attorney Grant — who is employed by Grant & Lebowitz — and Attorney Glore — who is employed by Dudley, Clark & Chan — should not be held in contempt for accepting funds restrained by the TRO. The following day, the trial judge issued his opinion on Miller's and Najawicz's motions to vacate the TRO, denying the motions because probable cause was established by Peru's affidavit and because the judge had jurisdiction over extraterritorial assets.

On October 3, 2008, the People moved for and were granted an extension of the TRO.

On October 22, 2008, the People filed an Information, charging Miller, Najawicz, Carty, and June A. Adams with 144 counts including multiple counts of CICO violations. The following day, the People filed a petition for an injunction pursuant to 14 V.I.C. § 606(f) together with a new probable cause affidavit by Peru.[5] On October 24, 2008, the People sought and obtained an extension of the *ex parte* TRO. The same day, the judge held a show cause hearing to determine whether Miller, Attorney Grant, and Attorney Glore should be held in contempt for violating the TRO. At the hearing, Miller argued that the court lacked jurisdiction over his extraterritorial assets, that the TRO's language *"and any other"* was ambiguous and did not clearly restrain all accounts in his name at PFCU, and that he did not have notice of the TRO at the time of his PFCU transfers. Attorneys Grant and Glore argued that they lacked knowledge that the funds they received from Miller came from a restrained account.

On November 6, 2008, the judge extended the TRO and all amendments thereto until November 21, 2008 or until such time as the judge to whom the criminal case had been assigned ruled on the People's petition for an injunction. A week later, Miller filed an opposition to the People's petition for injunction, arguing that, because the People had not adequately traced the assets, $1.4 million in salary and benefits not subject to forfeiture were being restrained, and that seizure of those non-forfeitable assets deprives him of his constitutional right to counsel of his choice. On November 17, 2008, the trial judge to whom the criminal case had been assigned held a hearing pursuant to 14 V.I.C. § 606(f) to determine the need to continue the pretrial restraint of the assets. The following day, a preliminary injunction was issued.

On November 26, 2008, the original trial judge issued his opinion on the show cause order, holding Miller, but not Attorneys Grant and Glore, in civil contempt of court. Specifically, the judge found that Miller's attorneys had knowledge of the *ex parte* TRO by August 11, 2008 and, therefore, notice of the TRO's restraint on his PFCU account was imputed to Miller. The judge held that Miller violated the TRO by transferring $1.1 million from his PFCU account — an amount that excludes the $100,000

---

[5] On March 4, 2009, the People filed an Amended Information.

transferred on August 8, 2008 — and ordered him to pay $1.1 million into the court's registry. Failure to transfer the funds by the stated deadline would result in Miller being imprisoned until he complied. Attorneys Grant and Glore were not adjudged in contempt because the People had failed to prove by clear and convincing evidence that the attorneys knew the $310,000 transferred to their client trust accounts was from a restrained account. Nevertheless, citing to the court's broad power to discipline attorneys as officers of the court for misconduct, the judge concluded that it would be improper for the attorneys to retain the funds in light of their client's contemptuous conduct. Accordingly, the attorneys were ordered to pay into the court's registry the unexpended sum of $260,000,[6] and failure to do so by the stated deadline would result in a show cause order. Additionally, the contempt order required Miller to pay the attorneys' $260,000 into the registry if they failed to do so.

On January 7, 2009, Miller moved for dissolution or modification of the preliminary injunction, arguing that Peru made false statements at the November 17, 2008 hearing and that $2,782,000 of his assets are not forfeitable because they were lawfully obtained. The People filed their opposition on February 6, 2009 and Miller replied on February 19, 2009. The record indicates that the trial court has not yet ruled on Miller's motion for dissolution or modification.

Miller's notice of appeal from the order denying his motion to vacate the TRO was filed on October 6, 2008, and his notice of appeal from the preliminary injunction was filed on November 19, 2008. Miller and his attorneys filed their notices of appeal from the civil contempt order on December 1, 2008 and December 3, 2008, respectively.

## II. DISCUSSION

### A. Jurisdiction and Standards of Review

#### 1. Jurisdiction over Miller's Appeal from the TRO and Preliminary Injunction

■ ■ We have jurisdiction over Miller's notice of appeal from the preliminary injunction pursuant to 4 V.I.C. § 33(b)(1) (Supp. 2008),

---

[6] This Court notes that the $1.1 million that Miller was ordered to pay into the court's registry already includes the $310,000 transferred to Attorneys Grant and Glore. Therefore, the civil contempt order requires the Appellants to pay into the registry $1,360,000 — an amount greater than that transferred from Miller's PFCU account.

which grants this Court jurisdiction over appeals from "[i]nterlocutory orders of the Superior Court . . . granting, continuing, modifying, or refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."[7] For the reasons stated in our November 17, 2008 order, this Court also has jurisdiction over the order denying Miller's motion to vacate the TRO pursuant to 4 V.I.C. § 33(b)(1). In that order, we held that:

> As a general rule, temporary restraining orders are not appealable interlocutory orders. However, temporary restraining orders that are continued, without the consent of the parties, for a substantial length of time past the period typically permitted by statute or court rule become, in effect, appealable preliminary injunctions. Here, although 14 V.I.C. § 606(h) states that a temporary restraining order shall expire within sixty days absent an extension for good cause, the Superior Court has extended the August 5, 2008 TRO beyond the typical sixty day period. Accordingly, the TRO has effectively become an appealable preliminary injunction.

*In re: Rodney E. Miller, Sr.*, Civ. No. 2008-080, at 2 n. 1, 2008 V.I. Supreme LEXIS 47, *4 (Nov. 17, 2008) (unpublished order) (internal citations omitted).[8]

### 2. Jurisdiction over the Appeals from the Civil Contempt Order

On appeal, the People question our jurisdiction over the timely appeals filed by Miller and his attorneys from the civil contempt order. As to Miller, the People appear to argue that the civil contempt order is a non-appealable interlocutory order. Miller counters that our November 17, 2008 order, which held that the TRO had ripened into a preliminary

---

[7] Federal Courts of Appeals have consistently exercised appellate jurisdiction over pretrial restraining orders in criminal forfeiture cases pursuant to 28 U.S.C. § 1292(a)(1) — the federal counterpart to 4 V.I.C. § 33(b)(1). *See, e.g., United States v. Kirschenbaum*, 156 F.3d 784, 788 (7th Cir. 1998) (collecting cases); *United States v. Ripinsky*, 20 F.3d 359, 361 (9th Cir. 1994); *In re Assets of Martin*, 1 F.3d 1351, 1355 (3d Cir. 1993); *United States v. Floyd*, 992 F.2d 498, 500 (5th Cir. 1993).

[8] Miller timely appealed from the preliminary injunction and the order denying the motion to vacate the TRO. *See U.S. v. Riley*, 78 F.3d 367, 369 n.3 (8th Cir. 1996) ("[The civil thirty-day rule] applies if the order being appealed is 'essentially a civil proceeding arising from a criminal one.' . . . [A]n order imposing preconviction restraints prior to forfeiture is, in substance, a civil proceeding for purposes of [the rules governing time to appeal].").

injunction, makes the contempt order appealable because it is part of a preliminary injunction. As to Attorneys Grant and Glore, the People seem to argue that they lack standing to appeal the order because they were not actually adjudged in contempt. Like Miller, the attorneys cite to 4 V.I.C. § 33(b)(1), which grants this Court jurisdiction over injunctions. In the alternative, the attorneys maintain that they were aggrieved by the civil contempt order because it requires them to transfer funds from their client trust accounts into the court's registry.

██ Importantly,

> [a] distinction is made, for appealability purposes, between criminal contempt proceedings which have for their purpose the vindication of the dignity and authority of the court, and civil contempt proceedings which are intended to enforce the rights of private parties, to compel obedience to orders and decrees made to enforce their rights and to give them a remedy to which the court deems them entitled. Civil contempt becomes appealable only when the contemnor has refused to comply with the remedial order and the court has exercised its authority either to punish or to coerce compliance.

*U.S. Steel Corp. v. Fraternal Ass'n of Steel Haulers*, 601 F.2d 1269, 1273 (3d Cir. 1979) (internal citations omitted). "Although an adjudication of civil contempt by a party is not generally deemed appealable . . . [courts] have held otherwise when it [was] issued in connection with another order that is appealable, such as an underlying preliminary injunction." *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1150, 1155 (3d Cir. 1982); *accord N.Y. Tel. Co. v. Commc'n Workers of Am.*, 445 F.2d 39, 46 (2d Cir. 1971) (civil contempt order is reviewable in connection with an appeal from an interlocutory order respecting an injunction). In this case, the order denying the motion to vacate the TRO is an appealable interlocutory order. Accordingly, we have jurisdiction to review Miller's appeal from the order adjudging him in civil contempt of court.

██ With respect to the attorneys' appeal from the civil contempt order, we must determine whether Attorneys Grant and Glore may appeal from an order which did not actually hold them in civil contempt of court. Notably, this Court, in ruling on a petition for writ of mandamus, stated that the petitioner could obtain appellate relief from an order threatening contempt by disobeying the order, standing in contempt, and appealing

from the contempt order. *See In re People of the V.I.*, 49 V.I. 297, 309 (V.I. 2007) (citing *In re Flat Glass Antitrust Litig.*, 288 F.3d 83, 91 (3d Cir. 2002)). The order at issue here merely threatens to hold the attorneys in contempt if they do not deposit the funds into the court's registry by the stated date. In fact, the order states only that the attorneys will be required to show cause for their failure to obey the court's order. Significantly, it is unclear to this Court what action, if any, the trial judge would take if the attorneys refused to obey the order to deposit the $260,000 into the court's registry.[9] Therefore, we conclude that the civil contempt order, as it relates to Attorneys Grant and Glore, lacks the finality necessary to trigger appellate review. *See United States v. Sciarra*, 851 F.2d 621, 628 (3d Cir. 1988) (holding that a non-party witness obtains a "stake" in the underlying action sufficient to warrant appellate review by standing in contempt); *see also U.S. Steel Corp.* 601 F.2d at 1273 ("Civil contempt becomes appealable only when the contemnor has refused to comply with the remedial order and the court has exercised its authority either to punish or to coerce compliance."). Accordingly, this Court lacks jurisdiction over the attorneys' appeal from the civil contempt order, and their appeal will be dismissed.[10]

### 3. *Standards of Review*

Our standard of review in examining the Superior Court's application of law is plenary, while findings of fact are reviewed only for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). "[T]he standard governing our review [of TROs and preliminary

---

[9] We note that, as the preliminary injunction currently freezes the funds in the attorneys' client trust accounts, it is uncertain whether the judge that issued the civil contempt order would hold the attorneys in contempt for failing to deposit the $260,000 into the court's registry.

[10] We note that "the doctrine of pendent appellate jurisdiction . . . allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." *Am. Soc'y for Testing & Materials v. Corrpro Cos., Inc.*, 478 F.3d 557, 580 (3d Cir. 2007) (internal quotations omitted). Importantly, however, "the discretionary exercise of pendent appellate jurisdiction is appropriate when the issue over which we have jurisdiction cannot be resolved without reference to the otherwise nonappealable issue." *Id.* In this case, we decline to apply this doctrine because Miller's appeals from the order denying the motion to vacate the TRO and the civil contempt order can be resolved without reference to the issues raised by the attorneys' appeal.

injunctions restraining assets] is that accorded to grants or denials of preliminary injunctions, *i.e.*, whether the [trial] court abused its discretion, committed an obvious error in applying the law, or made a clear mistake in considering the proof." *In re Assets of Martin*, 1 F.3d 1351, 1357 (3d Cir. 1993). However, to the extent that our decision "depends upon a question of law, *i.e.*, whether . . . substitute assets are subject to pre-conviction . . . restraints, we are exercising plenary review." *Id.* In addition, we review the trial court's order adjudging Miller in civil contempt of court for an abuse of discretion. *See Gregory v. Depte*, 896 F.2d 31, 34 (3d Cir. 1990).

## B. The Statutory Scheme of CICO's Criminal Forfeiture Provisions

At the outset, we find it prudent to examine the statutory framework of CICO and the interplay of its various pre-trial asset restraint provisions. Pursuant to 14 V.I.C. § 606(a), "any person convicted of conduct constituting a violation of any provision of section 605 of [the CICO chapter] shall be guilty of a felony and may be fined not more than $500,000 or imprisoned not more than 15 years, or both." In addition, section 606(c) provides that a person convicted of violating CICO *"may* be required to criminally forfeit . . . to the Government . . . any real or personal property *used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of section 605 . . . ."* 14 V.I.C. § 606(c) (emphases added).[11] In this case, the People's initial request for pre-trial restraint was based on allegations that Miller had violated CICO's provisions. Subsequently, Miller was charged with violating sections 605(a)[12] and (d)[13] of CICO, in addition to multiple non-CICO offenses.

---

[11] Unlike under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), criminal forfeiture of assets upon conviction is discretionary under CICO. *See* 18 U.S.C. § 1963(e) (Westlaw 2009) ("Upon conviction of a person under [RICO], the court *shall* enter a judgment of forfeiture of the property . . . ." (emphasis added)).

[12] "It is unlawful for an person employed by, or associated with, any enterprise, as that term is defined herein, conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of criminal activity." 14 V.I.C. § 606(a).

[13] "It is unlawful for any person to conspire or attempt to violate, either directly or through another or others, the provisions of section 605, subsections (a), (b), and (c)." 14 V.I.C. § 606(d).

Section 606 of CICO authorizes a Superior Court judge to order pre-trial restraint of assets belonging to a person who is alleged to have violated CICO's provisions in order to preserve the reachability of property alleged to be subject to criminal forfeiture during the pendency of the criminal proceedings. *See* 14 V.I.C. § 606(f)-(h). The applicable statutory provision depends on the stage of the criminal proceedings at the time the restraint is sought and whether the defendant is afforded a hearing prior to entry of the TRO or injunction.

Under 14 V.I.C. § 606(h), a trial court judge may grant a sixty-day *ex parte* TRO which restrains property subject to criminal forfeiture if (1) an information alleges that the property is subject to forfeiture or a court of competent jurisdiction determines that there is probable cause to believe that the property would be forfeitable upon conviction; (2) the property is in the defendant's possession or control; and (3) the trial court determines that "the nature of the property is such that it can be disposed of or placed beyond its jurisdiction before any party may be heard in opposition." The *ex parte* TRO may be extended beyond sixty days for good cause shown or with the defendant's consent. In the instant case, Miller's assets were initially restrained pursuant to section 606(h)'s *ex parte* TRO provision, and the *ex parte* TRO was extended multiple times.

Under title 14, sections 606(f) and (g), the trial court judge may enter a restraining order or injunction, require execution of a performance bond, or take any other action including the appointment of a receiver after conducting a hearing at which the defendant and any other affected person may participate. If the People have filed an information, the court may, based upon the information, enter a restraining order or injunction if the People have shown "by a preponderance of the evidence [that restraint] is necessary to preserve the reachability of property alleged to be subject to criminal forfeiture. *See* 14 V.I.C. § 606(f). However, if no information has been filed, the People must show — in addition to the showing required under section 606(f) — that there is probable cause to believe that the property would be subject to criminal forfeiture if convicted and that the need to preserve the reachability of the property is outweighed by any harm to the defendant. *See* 14 V.I.C. § 606(g). Any order issued under section 606(g) lasts only ninety days unless extended for good cause shown or unless an information is filed which alleges that the property is subject to criminal forfeiture. Subsequent to entry of the *ex*

*parte* TRO in this case, Miller's assets were restrained pending trial pursuant to a preliminary injunction issued under section 606(f)(1).

## C. The Issuance of the *Ex Parte* TRO Was Not an Abuse of Discretion

As his first issue on appeal, Miller contends that the trial court lacked both subject matter jurisdiction and personal jurisdiction to enter the August 5, 2008 *ex parte* TRO, which restrained various extraterritorial assets belonging to Miller as well as several real properties located within the Virgin Islands. Citing to section 2 of the Revised Organic Act, Miller argues that the trial court's jurisdiction does not extend beyond the "the territorial domain, islands, cays, and waters [of the U.S. Virgin Islands] . . . ." The Revised Organic Act of 1954, § 2, 48 U.S.C. § 1541, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 76-77 (1995) (preceding V.I. CODE ANN. tit. 1) [hereafter "the ROA"]. However, section 2 of the ROA is not a jurisdictional statute; it merely defines the geographical composition of the Virgin Islands. Rather, section 21(b) of the ROA confers subject matter jurisdiction upon the Superior Court over "all causes in the Virgin Islands." Additionally, 4 V.I.C. § 76 (1997) gives the Superior Court original jurisdiction over all civil and criminal actions. Notably, Miller does not dispute that the alleged CICO violations occurred entirely within the Virgin Islands or that the trial court has subject matter jurisdiction over his prosecution for the alleged offenses. Instead, he disputes the trial court's jurisdiction to restrain assets that are beyond the territorial boundaries. Accordingly, we turn to CICO to determine the nature of its criminal forfeiture provisions and whether the Superior Court lacked personal jurisdiction to restrain Miller's extraterritorial assets.[14]

### 1. *CICO's Criminal Forfeiture Provisions are In Personam in Nature as to Extraterritorial Assets*

In denying Miller's motion to vacate the TRO, the trial judge stated that, because "CICO is cast in the mold of the federal RICO statute," the

---

[14] We emphasize that, although the trial court's initial and subsequent TROs purportedly applied to multiple individuals and institutions, our decision herein is strictly limited to whether the trial court had the authority to issue the *ex parte* TRO restraining the assets named therein belonging to Miller. Importantly, we do not decide whether the trial court had the authority to issue the TROs with respect to any other party or non-party, as those individuals did not appeal to this Court.

TRO was an *in personam*, rather than an *in rem*, restraint which operated to prevent Miller from engaging in certain conduct with respect to the real and personal properties identified in the TRO. (J.A. 158-59.) (internal quotations omitted). The People agree that CICO is *in personam* in nature and cite to several United States Courts of Appeal decisions designating RICO as *in personam. See, e.g., United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990); *United States v. Ginsburg*, 773 F.2d 798 (7th Cir. 1987). Relying upon those decisions, the People argue that the trial court had jurisdiction to restrain Miller's extraterritorial assets because the government's interest in the forfeitable property vests at the time of the unlawful conduct, making it impossible for a defendant to defeat post-conviction forfeiture by transferring the assets.

■ ■ The People misconstrue the applicability of *Angiulo* and *Ginsburg* to this case. First, those decisions clearly concern post-conviction forfeiture rather than pre-trial restraint of forfeitable property. *See Ginsburg*, 773 F.2d at 801 ("RICO forfeiture is a punishment imposed on a guilty defendant"); *see also United States v. Sandini*, 816 F.2d 869, 873 (3d Cir. 1987) ("criminal forfeitures are based on findings of personal guilt"). As the Second Circuit Court of Appeals has pertinently stated, "[t]he distinction between forfeiture and pretrial restraint is no technical play on words." *United States v. Razmilovic*, 419 F.3d 134, 137 (2d Cir. 2005). In this case, the TRO merely restrained Miller's assets prior to conviction. While pretrial restraint clearly occurs prior to conviction, CICO, like RICO, does not allow for criminal forfeiture until after conviction. *See* 14 V.I.C. § 606(c) ("Any person *convicted* of conduct constituting a violation of [section 605 of CICO] may be required to criminally forfeit [assets derived from that conduct]." (emphasis added)); 14 V.I.C. § 606(d) (requiring the trial court to return a special verdict of forfeiture after conviction). Significantly, Miller has not yet been tried or convicted of the alleged CICO offenses. Second, the People fail to distinguish between when the government's interest in the forfeitable property vests and when it attaches. Although the government's interest may vest at the time the alleged CICO offense is committed, *Ginsburg* clearly states that "the government's interest in property subject to criminal forfeiture does not attach *until the defendant is convicted of the crime* for which the forfeiture is imposed." *See* 773 F.2d at 801 (emphasis added). Thus, *Angiulo* and *Ginsburg* do not themselves establish, as the People argue, that a criminal forfeiture action under CICO is *in personam*

in nature or that the trial court has *in personam* jurisdiction to issue a *pre-trial ex parte* TRO that restrained, rather than forfeited, Miller's assets.

 Importantly, it is within the Legislature's discretion to deem a forfeiture statute *in personam* or *in rem*. *See, e.g., D.A. of Queens County v. McAuliffe*, 129 Misc. 2d 416, 493 N.Y.S.2d 406, 412 (N.Y. Sup. Ct. 1985); *State v. Peterson*, 201 Wis. 20, 229 N.W. 48, 50 (1930). However, the Virgin Islands Legislature has not expressly declared whether CICO's forfeiture proceedings are *in personam* or *in rem*. *Cf.* KAN. STAT. ANN. § 60-4115(a) (Westlaw 2009) ("The court shall order the forfeiture of any other property of an owner or *in personam* defendant . . . ."), *and McAuliffe*, 493 N.Y.S.2d at 412 ("The New York State Legislature was unequivocal in its designation of the CPLR Article 13-A Civil Forfeiture Act as being *In Personam* in nature . . . ."). Therefore, we must determine in the first instance whether CICO's criminal forfeiture provisions are *in personam* or *in rem*.

 In *Sandini*, the Third Circuit Court of Appeals succinctly explained the distinction between *in personam* and *in rem* forfeiture proceedings:

> Sharp differences exist between the *in rem* and *in personam* forfeitures, and failure to observe them sometimes leads to confusion. Civil forfeiture is an *in rem* proceeding. The property is the defendant in the case, and the burden of proof rests on the party alleging ownership. The innocence of the owner is irrelevant-it is enough that the property was involved in a violation to which forfeiture attaches.
>
> . . . .
>
> In contrast, criminal or *in personam* forfeiture differs because its prime objective is punishment of the owner. The owner or possessor of the property is the defendant, and the burden of proof falls on the government. Insofar as the forfeiture rests on illegal activity, the elements of the underlying crime must be established by proof beyond a reasonable doubt.

*Sandini*, 816 F.2d at 872-73; *see also United States v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1218 (10th Cir. 1986) ("Criminal forfeiture is distinct from civil forfeiture because it is a proceeding brought against a person rather than a thing."). Moreover, in general an action is considered

*in personam* when it is "brought against a person rather than property." BLACK'S LAW DICTIONARY, 32 (8th ed. 2004).

■ Although CICO provides for both civil and criminal forfeitures, the People have elected in this case to seek *ex parte* pre-trial restraint of Miller's assets pursuant to the criminal forfeiture provision of 14 V.I.C. § 606(h). *Compare* 14 V.I.C. § 606 (titled "Criminal Penalties") *with* 14 V.I.C. § 607 (titled "Civil Remedies"). It is clear based upon the language of the statute that forfeiture under 14 V.I.C. § 606 is a punishment imposed upon the owner of the property after he has been found guilty of violating CICO, rather than an action brought specifically against Miller's property. Moreover, the filing of the Information on October 22, 2008 is further proof that the People seek forfeiture as a punishment for Miller's alleged violation of CICO. Accordingly, we hold that CICO's criminal forfeiture provisions are *in personam* in nature.

### 2. The Ex Parte TRO Is Not Void for Lack of Personal Jurisdiction

■ Having determined that CICO's criminal forfeiture provisions are *in personam* in nature, we now determine whether, as Miller argues, the *ex parte* TRO was void for lack of personal jurisdiction.[15] As the United States Supreme Court has stated, it is:

> [a] well-recognized principle that, when the subject-matter of a suit in a court of equity is within another state or country, but the parties within the jurisdiction of the court, the suit may be maintained and remedies granted which may directly affect and operate upon the person of the defendant, and not upon the subject-matter, although the subject-matter is referred to in the decree, and the defendant is ordered to do or refrain from [doing] certain acts toward it, and it is thus ultimately but indirectly affected by the relief granted. In such case, the decree is not of itself legal title. It must be executed by the party, and obedience is compelled by proceedings in the nature of contempt, attachment, or sequestration. On the other hand, where the suit is strictly local, the subject-matter is specific property, and the relief, when

---

[15] We note that the August 8, 2008 TRO and its subsequent amendments have been superseded by the preliminary injunction, which was issued on November 18, 2008. Thus, the issues relating to the TRO would ordinarily be considered moot. In this case, however, it is still necessary to address the validity of the TRO as it underlies the civil contempt order.

granted, is such that it must act directly upon the subject-matter, and not upon the person of the defendant, the jurisdiction must be exercised in the state where the subject-matter is situated.

*Fall v. Eastin*, 215 U.S. 1, 11-12, 30 S. Ct. 3, 8, 54 L. Ed. 2d 65 (1909) (original emphases omitted) *see also Humble Oil & Refining Co. v. Copeland*, 398 F.2d 364, 367 (4th Cir. 1968) (stating that *in personam* decree enables court with personal and subject matter jurisdiction to issue order affecting extraterritorial property).[16] *Fall* illustrates that the *in personam* nature of CICO's criminal forfeiture statute authorizes a trial judge to order a defendant to do or refrain from doing something with respect to property that is located outside the territory. Thus, an *in personam* action enables a judge to issue orders that indirectly affect a defendant's extraterritorial property even though the judge lacks *in rem* jurisdiction to issue orders that affect such extraterritorial property directly.

▇ The TRO at issue in this case orders that "[t]he accountholders are not allowed to conduct any transaction on [the listed] accounts at the above-stated financial institutions . . . ." (J.A. 59.) Additionally, the TRO provides that "the owner(s) of record . . . may [not] alienate, transfer, conceal, encumber, or dispose of any personal property stated [in the TRO] . . . ." (*Id.*) By these statements, the TRO permissibly orders Miller, as a defendant, owner of record and accountholder, to refrain from certain conduct with respect to his extraterritorial property. However, as *Fall* clearly states, the defendant must be "within the jurisdiction of the court" before the trial court may issue such orders that directly operate upon the defendant and indirectly affect his extraterritorial assets. *See* 215 U.S. at 11, 30 S. Ct. at 8. Thus, we must establish at which point Miller came within the jurisdiction of the Court and became, therefore, subject to the restraints of the TRO.

▇▇ In holding that he had personal jurisdiction to issue the *ex parte* TRO as to Miller, the trial judge relied in part on the civil minimum contacts analysis set out in *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945). It has been consistently held, however, that *Int'l Shoe's* minimum contacts analysis is inapposite in criminal

---

[16] Because an injunction is an equitable remedy, the trial court acts as a court of equity when it issues injunctive relief. *See, e.g., Knott v. Evans*, 280 Ga. 515, 630 S.E.2d 402, 404 (2006).

cases. *See, e.g., Boyd v. Meachum,* 77 F.3d 60, 66 (2d Cir. 1996) (federal constitutional requirements of civil personal jurisdiction not applicable in criminal cases); *Ex parte Boetscher,* 812 S.W.2d 600, 602 (Tex. Crim. App. 1991) ("A 'minimum contacts' analysis is not applicable to establish jurisdiction in criminal prosecutions."); *State v. Amoroso,* 975 P.2d 505, 508 (Utah Ct. App. 1999) ("The rule is well-settled that civil 'minimum contacts' analysis has no place in determining whether a state may assert criminal personal jurisdiction over a foreign defendant."); *Rios v. State,* 733 P.2d 242, 244 (Wyo. 1987) ("[T]he concept of minimum contacts . . . has no application to criminal cases").[17] We note that in this case, the People sought, and the trial court granted, restraint of Miller's assets pursuant to 14 V.I.C. § 606 — the criminal forfeiture statute, which would ordinarily render the civil minimum contacts analysis inapplicable. Despite the fact that the *ex parte* TRO was issued pursuant to the criminal forfeiture statute, our consideration of the nature and purpose of pre-trial restraining orders and injunctions sought to restrain criminally forfeitable property leads us to conclude that the civil rules of procedure apply to such orders.

 First, it is clear that a civil action is "[a]n action to enforce, redress or *protect* a private or civil right," whereas a criminal action is "[a]n action instituted by the government to punish offenses against the public." BLACK'S LAW DICTIONARY, 32 (emphasis added). Additionally, a TRO is civil equitable relief granted for the purpose of "preserving the status quo." *Id.* at 1505. Here, the People sought temporary restraint of property

---

[17] To determine when a court obtains personal jurisdiction over a criminal defendant, courts look to the date the criminal defendant personally appears before the court, usually for arraignment. *See, e.g., State ex rel. Baumert v. Mun. Court of Phoenix,* 124 Ariz. 543, 606 P.2d 33, 35 (1979); *Burns v. Mun. Court of Los Angeles Judicial Dist.,* 195 Cal. App. 2d 596, 16 Cal. Rptr. 64, 68 (1961); *State v. Rogers,* 140 Idaho 223, 91 P.3d 1127, 1132 (2004); *People v. Speed,* 318 Ill. App. 3d 910, 743 N.E.2d 1084, 1088, 252 Ill. Dec. 928 (2001); *Smith v. State,* 237 Ind. 244, 143 N.E.2d 408, 409 (1957); *State ex rel. Adams v. Riggs,* 252 Minn. 283, 89 N.W.2d 898, 902 (1958); *People v. Byfield,* 131 Misc. 2d 884, 502 N.Y.S.2d 346, 347 (N.Y. Crim. Ct. 1986); *State v. Arnold,* 379 N.W.2d 322, 323 (S.D. 1986); *State v. Cronin,* 130 Wn.2d 392, 923 P.2d 694, 697 (1996); *State v. Dietzen,* 164 Wis. 2d 205, 474 N.W.2d 753, 755 (1991). In this case, Miller did not personally appear before the trial court until August 22, 2009, which is when he appeared for the hearing on his motion to vacate the TRO. Thus, if we were concerned solely with the trial court's jurisdiction to prosecute Miller for the alleged CICO violations, August 22, 2009 would be the operative date upon which the trial court obtained personal jurisdiction. However, as we conclude herein, the *ex parte* TRO is subject to the civil rules of procedure.

to which the People would be entitled if the defendant was charged with and convicted of violating CICO. Thus, the purpose of the TRO was to protect or preserve the forfeitable property, not to punish Miller. Finally, it is significant that the Federal Rules of Civil Procedure have been applied by federal courts to pre-trial orders restraining property that is subject to criminal forfeiture. *See, e.g., United States v. Holy Land Found. For Relief and Dev.*, 445 F.3d 771, 788 (5th Cir. 2006) ("The requirements of Federal Rule of Civil Procedure 65 apply to the issuance of restraining orders and injunctions issued pursuant to 21 U.S.C. § 853(e)(1)(A)."); *United States v. Riley*, 78 F.3d 367, 369 n.3 (8th Cir. 1996) ("The merits of a preconviction order restraining [criminally] forfeitable assets are governed by the civil standards for temporary restraining orders and preliminary injunctions."); *United States v. Crozier*, 777 F.2d 1376, 1382-84 (9th Cir. 1985) (holding that Federal Rule of Civil Procedure 65 governs a criminal forfeiture restraining order in the absence of valid procedural guidelines); *see also Boyd v. U.S. Dept. of Justice*, 673 F. Supp. 660, 662 (E.D.N.Y. 1987) (motion for return of seized property dismissed as action was more properly a civil proceeding subject to the Federal Rules of Civil Procedure). In light of the above, we hold that, although the *ex parte* TRO is authorized under a broad criminal statutory scheme targeting corrupt organizations, it is nevertheless a civil equitable remedy and the civil rules of procedure and the territorial long-arm statute govern when determining personal jurisdiction over nonresident defendants.

 Having determined that the *ex parte* TRO is subject to the civil rules of procedure and the civil concepts for personal jurisdiction, we now determine the point at which the trial court obtained personal jurisdiction over Miller, a Florida resident. As the Third Circuit Court of Appeals has explained:

> Establishing personal jurisdiction in the Virgin Islands involves a two-part analysis. First, there must be a statutory basis for exercising jurisdiction over the nonresident defendant in accordance with the Virgin Islands Long-Arm Statute, V.I. CODE ANN. tit. 5, § 4903, and second, the nonresident defendant must have minimum contacts with the Virgin Islands sufficient to satisfy constitutional due process.

*Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330, 51 V.I. 1219 (3d Cir. 2009). First, the long-arm statute was satisfied in this case because it

authorizes the trial court to "exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting any business in this territory . . . ." 5 V.I.C. § 4903(a)(1) (1997). The relief sought here, namely the *ex parte* TRO, clearly arose from Miller's activities as CEO and President of the hospital. *See* 5 V.I.C. § 4903(b) ("When jurisdiction over a person is based solely upon [the long-arm statute], only a claim for relief arising from acts enumerated in [section 4903(a)] may be asserted against him.").

 Second, when determining whether minimum contacts exist, we assess "whether the quality and nature of the defendant's activity is such that it is reasonable and fair to require [that he] conduct [his] defense in that state."[18] *Metcalfe*, 566 F.3d at 334 (emphasis omitted). "It is essential . . . that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 260 (3d Cir. 2000) (internal quotations omitted) (second alteration in original)). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . " *Id.* (internal quotations omitted). In this case, because Miller lived in the Virgin Islands and was employed by the hospital for several years, his contacts with this jurisdiction cannot be considered random or attenuated. Moreover, it is clear that Miller purposefully availed himself of the privileges of conducting activities within the Virgin Islands as he negotiated and renegotiated the terms of his employment contracts.

 Although we conclude that the long-arm statute is satisfied and that Miller had sufficient minimum contacts with the Virgin Islands, our analysis is not complete. As the Supreme Court of the United States succinctly explained,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of sum-

---

[18] *International Shoe's* minimum contacts analysis applies to persons as well as to corporations. *See Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 n.9 (5th Cir. 1982).

mons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Inc. v. Rudolf Wolff & Co. Ltd.*, 484 U.S. 97, 104, 108 S. Ct. 404, 409, 98 L. Ed. 2d 415 (1987). In this case, it is clear that Miller was never formally served with the TRO, which was issued under seal. Because *Omni Capital Int'l* expressly states that mere notice of the TRO is not sufficient to confer personal jurisdiction on the trial court, we must ascertain precisely when Miller consented, if at all, to the court's jurisdiction over him. *See, e.g., Zelson v. Thomforde*, 412 F.2d 56, 59 (3d Cir. 1696) (personal jurisdiction is not lacking where defendant has entered an appearance by filing a motion or otherwise); *S.E.C. v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979) ("[Defendant] can confer jurisdiction over his person upon a court otherwise lacking that jurisdiction by expressly consenting to it.")

 The record reveals that Miller's attorney, Attorney Glore, appeared at the August 18, 2008 hearing on the motions filed by Najawicz and Carty. Importantly, the record reveals that Miller's attorney entered a general appearance rather than a special or limited appearance. *See, e.g., Williams v. Williams*, 46 N.C. App. 787, 266 S.E.2d 25, 28 (1980); ("[A] general appearance by a party's attorney will dispense with process and service"); *Springs v. Springs*, 234 A.D.2d 552, 651 N.Y. S.2d 579, 579 (N.Y. App. Div. 1996) ("[T]he attorney's appearance without asserting the defense of lack of personal jurisdiction conferred personal jurisdiction over his client."); *Nixon v. Rowland*, 192 Va. 47, 63 S.E.2d 757, 759 (Va. 1951) ("[A] general appearance in a case is a waiver of process, equivalent to personal service of process, and confers jurisdiction of the person on the court; but to have this effect the appearance must have been authorized"); 7A C.J.S. *Attorney & Client* § 239 (Westlaw 2009) ("While the general appearance by an attorney submits his or her client to the jurisdiction of the court if the appearance has been authorized, it has also been held that no specific authority to enter a general appearance is necessary, and that a client may be bound by his or her attorney's general appearance although the authority actually granted was to make only a special appearance. The general rule is that an attorney is presumed to have authority to appear and act on behalf of his or her client unless it is shown conclusively that the attorney was not authorized to do so."). "A special appearance is one whose sole purpose is to question the jurisdiction of the court." 6 C.J.S. *Appearances* § 3 (Westlaw 2009).

There is nothing in the record of proceedings below to indicate that Attorney Glore's August 18, 2008 entry of appearance on behalf of Miller was for the limited purpose of challenging the jurisdiction of the court nor is there anything to rebut the presumption that Attorney Glore had authority to enter a general appearance on behalf of Miller. Therefore, we conclude that the trial court obtained personal jurisdiction over Miller for the purpose of directing him to act or not to act with respect to his extraterritorial property at the latest upon his attorney's general appearance on August 18, 2008. Accordingly, we hold that the *ex parte* TRO, as it relates to Miller, is not void for lack of personal or subject matter jurisdiction and that Miller's arguments to the contrary lack merit. As a consequence, Miller became subject to the restraint of his extraterritorial assets, as specified in the TRO, at least as of August 18, 2008.

### D. The Trial Court Abused its Discretion When it Held Miller in Civil Contempt

As his second issue on appeal, Miller argues that the November 26, 2008 Superior Court order adjudging him in civil contempt of court is invalid either because the TRO was void for lack of jurisdiction or because the TRO was ambiguous as to whether it restrained the PFCU account from which Miller transferred $1.2 million in funds. In adjudging Miller in civil contempt, the trial court held that Miller had violated the *ex parte* TRO by each transfer from his PFCU account except for the initial $100,000 transfer to his mother. As the United States Supreme Court stated in *Fall*, obedience of an *in personam* decree may be compelled through contempt proceedings. 215 U.S. at 11, 30 S. Ct. at 8. "[C]ivil contempt proceedings . . . are intended to enforce the rights of private parties, to compel obedience to orders and decrees made to enforce their rights and to give them a remedy to which the court deems them entitled." *U.S. Steel Corp.*, 601 F.2d at 1273. "To prove civil contempt the court must find [by clear and convincing evidence] that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *Harris v. Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995). Importantly, "[a] contempt citation should not be granted if there is ground to doubt the wrongfulness of the defendant's conduct." *Harris*, 47 F.3d at 1326. "A person will not be held in contempt of an order unless the order has given him fair warning that

339

his acts were forbidden." *United States v. Christie*, 465 F.2d 1002, 1006 (3d Cir. 1972). Thus, the "resolution of ambiguities ought to favor the party charged with contempt." *Harris*, 47 F.3d at 1326.

█ As one ground for arguing that the civil contempt order is invalid,[19] Miller contends that the underlying TRO was ambiguous as to whether it restrained him from transferring funds from the particular PFCU account from which he transferred $1.2 million during the month following entry of the TRO. The relevant portion of the *ex parte* TRO states that it restrains "Bank account #406266680272930 in the name of Rodney E. Miller, Sr. at [PFCU], Eisenhower Avenue, Alexandria, Virginia 22314, *and any other*." (J.A. at 58.) (emphasis in original). It is undisputed that the specifically restrained bank account #406266680272930 is not the account from which the allegedly contemptuous transfers were made. Certified records from PFCU clearly establish that the actual account from which Miller transferred $1.2 million is account #4336296-03-5.[20] (J.A. at 911-921.) Nevertheless, the People argue on appeal, and the trial court held below,[21] that the phrase "*and any other*" clearly restrains any other account that Miller may own at PFCU.

Viewing the TRO as a whole, we observe that the trial court employed the phrase "*and any other*" after some clauses which identify specific accounts but not others. For example, the trial court did not use the phrase

---

[19] Miller also argues that the civil contempt order is invalid because the trial court lacked jurisdiction to issue the underlying TRO. As indicated by the first prong of the test, a civil contempt order may not issue if it is based upon a court order that is invalid, because "the right to remedial relief falls with an injunction which events prove was erroneously issued, and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court." *United States v. United Mine Workers*, 330 U.S. 258, 294-95, 67 S. Ct. 677, 696-97, 91 L. E. 884 (1947) (internal citations omitted). Because we have concluded that the trial court obtained personal jurisdiction over Miller on August 18, 2008 and because the trial court held Miller in contempt only for those transfers made on and after August 18, 2008, the first prong of the test appears to be met. However, given our holding with respect to the ambiguity of the TRO, it is unnecessary for us to ultimately decide this issue.

[20] In fact, it appears from the record that the account listed in the TRO, i.e. #406266680272930, does not represent any account belonging to Miller at PFCU. The certified records indicate that Miller has the following three accounts at PFCU: #4062668-02-7, #2821518-01-2, and #4336296-03-5.

[21] In the civil contempt order, the trial judge stated that "[a]lthough there may have been a clearer manner in which the specific accounts could have been identified, reasonable people would not differ on the appropriate interpretation of the phrase at issue." (J.A. at 329.)

when it restrained "Any and all accounts in the name of [Miller and his wife] at the Community Bank of Broward County, 1504 Weston Road, Florida 33326 . . . " (J.A. 58.) However, the court used the phrase in several clauses that already purport to restrain all accounts at a designated bank. For instance, the TRO restrains "Any and all Bank of Nova Scotia accounts in the name of Peter R. Najawicz and Julie Najawicz, *and any other*." If the phrase *"and any other"* indeed means "and any other account," then this clause would redundantly read "Any and all Bank of Nova Scotia accounts in the name of Peter R. Najawicz and Julie Najawicz, *and any other [accounts]*." Rather than concluding that the trial court inexplicably used duplicative language, it is just as reasonable to conclude that, when the trial court sought to restrain every account at a particular bank, it expressly used the phrase "[a]ny and all accounts."

In reviewing the TRO for ambiguity, we do not endeavor to determine every reasonable interpretation to which the phrase *"and any other"* is subject.[22] In light of the fact that the trial court explicitly restrained "any and all accounts" in those clauses where it did not name a specific bank account number, we cannot say that Miller had fair warning that the TRO restrained all PFCU accounts in addition to the specified account #406266680272930.[23] [24] Since the Court must resolve any ambiguity in favor of the party charged with contempt, we conclude that the TRO was ambiguous as to whether it prohibited Miller from transferring funds from a PFCU account other than #406266680272930. *See Harris*, 47 F.3d at 1326; *see also United States v. Conces*, 507 F.3d 1028, 1042 (6th Cir. 2007) ("The order in question must be 'definite and specific,' and 'ambiguities must be resolved in favor of persons charged with [civil] contempt.' "); *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (resolving all ambiguity in underlying order in favor

---

[22] Miller contends that the phrase could also mean *"and any other [person]"* or *"and any other [location]."*

[23] While Miller's multiple financial transfers soon after entry of the *ex parte* TRO may suggest that Miller knew the TRO purported to restrain all of his accounts at PFCU, it is equally plausible that Miller immediately transferred the $1.2 million from the PFCU account because he believed, based on the language of the TRO, the account to be one of the few accounts to which he still had unrestrained access.

[24] Moreover, it is doubtful that the trial court could find probable cause based on Peru's first affidavit to restrain any of Miller's PFCU accounts other than PFCU account #406266680272930, as that was the only account to which the affidavit referred that received wire transfers from the hospital's Scotia Bank account.

of party charged with civil contempt); *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (same). Accordingly, we hold that the trial court abused its discretion when it adjudged Miller in civil contempt of court for transferring funds from an account that was not specifically and unambiguously restrained.

### E. CICO Does Not Permit Pre-Conviction Restraint of Substitute Assets

As his third issue on appeal, Miller argues that the November 18, 2008 preliminary injunction impermissibly orders pre-trial restraint of substitute assets, which violates his Sixth Amendment[25] right to use lawfully-obtained funds to pay for his counsel of choice. The People disagree that CICO exempts substitute assets from pre-trial restraint and argue that the pre-trial restraint of Miller's forfeitable assets does not violate the Sixth Amendment. Pursuant to 14 V.I.C. § 606(f)(1), the trial court restrained all of Miller's PFCU accounts and all of his accounts located at two Florida banks.[26] Miller maintains that $1.3 million of the funds in the restrained accounts were lawfully-obtained pursuant to employment contracts with the hospital and profits from the sale of real property purchased prior to 2004, the year in which the People allege his criminal conduct began.

#### 1. *Pre-trial Restraint of Substitute Assets Is Not Permitted under CICO*

In support of his argument that substitute assets may not be restrained prior to conviction, Miller cites to several decisions of the United States Courts of Appeal construing the so-called substitute assets provision of the federal RICO statute.[27] *See, e.g., In re Assets of Martin*, 1 F.3d at 1362

---

[25] The Sixth Amendment is made applicable to the Virgin Islands pursuant to section 3 of the ROA.

[26] We note that, unlike in the *ex parte* TRO, the ambiguous phrase *"and any other"* does not appear anywhere in the preliminary injunction.

[27] 18 U.S.C. § 1963(m) — the substitute assets provision of RICO — provides:

If any of the property described in subsection (a), as a result of any act or omission of the defendant —

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(holding that "pretrial orders may not be entered to preserve the availability of substitute assets"). In opposition, the People argue that the federal decisions are inapposite because CICO permits pre-trial restraint to preserve any assets subject to forfeiture, including any assets that may be forfeited as substitute property. Specifically, the People point out that, unlike the corresponding federal RICO provision, CICO's asset restraint provision does not expressly limit the property that may be restrained prior to conviction. *Compare* 14 V.I.C. § 606(f)(1) (providing for issuance of an injunction or restraining order to restrain "property alleged to be subject to criminal forfeiture") *with* 18 U.S.C. § 1963(d)(1) (Westlaw 2009) (providing for issuance of an injunction or restraining order to restrain "property described in subsection (a) [which lists the property the defendant shall forfeit upon conviction]").

 The People assert that we should decline to hold that CICO prohibits pre-trial restraint of substitute assets because the statute plainly on its face allows for pre-trial restraint of any property that is subject to forfeiture, even if that property is not explicitly described in 14 V.I.C. § 606(c). However, the People overlook the fact that, even though 14 V.I.C. § 606(f) does not reference 14 V.I.C. § 606(c), section 606(c) gives meaning to the phrase "property subject to criminal forfeiture" as used in section 606(f) and elsewhere in CICO. Section 606(c) provides, in relevant part, that "[a]ny person convicted of [violating CICO] may be required to criminally forfeit . . . *any real or personal property used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of [CICO]* . . . ." 14 V.I.C. § 606(c) (emphasis added). Thus, on its face, CICO clearly allows for pre-trial restraint only of "real or personal property used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of [CICO]."

Pursuant to the so-called substitute assets provision of CICO, which is nearly identical to the corresponding federal RICO provision,

---

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty; the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

■ [i]f any property included in a special verdict[28] of criminal forfeiture:

(1) cannot be located;

(2) has been sold to a bona fide purchaser for value;

(3) has been placed beyond the jurisdiction of the court;

(5) has been commingled with other property that cannot be divided without difficulty or undue injury to innocent persons; or

(6) is otherwise unreachable without undue injury to innocent persons *the trial court may order forfeiture of any other property of the defendant up to the value of the property that is unreachable.*

14 V.I.C. § 606(e) (emphasis added). Importantly, we address whether CICO allows for pre-trial restraint of substitute assets "from the approach of determining what [the Legislature] intended [because] [w]hile there might be good reason to allow a court to order pre-trial restraints to preserve [substitute assets], only [the Legislature] can do so." *In re Assets of Martin*, 1 F.3d at 1361 n.12.

When determining whether a Kansas forfeiture statute similar to CICO authorized pre-trial restraint of substitute assets, the Court of Appeals of Kansas concluded that "[t]he statutory provisions governing when an item of property is forfeitable because of its relationship to the criminal activity operate independently of the substitution provision." *State ex rel. Riley County Police Dept. v. $1,489.00 U.S. Currency*, 31 Kan. App. 2d 54, 59 P.3d 1045, 1049 (2002). The appellate court reasoned that the plain language and the evident statutory scheme lead to the conclusion that the substitute asset provision has no applicability until some other asset has been deemed forfeitable by a separate provision and the court is prevented from seizing that other asset for one of the reasons listed in the substitute asset provision. *See id.* Additionally, the Tenth Circuit Court of Appeals' has explained the general distinction between forfeitable assets and substitute assets:

An asset cannot logically be both forfeitable and a substitute asset. To allow such an anomaly would render the substitute assets provision

---

[28] Even if a defendant is convicted of violating CICO, forfeiture may not be ordered until the trial court returns a "special verdict" as defined in 14 V.I.C. § 604(p) and in accordance with 14 V.I.C. § 606(d).

meaningless. Assets involved in or traceable to the offense are forfeit-
able . . . . The substitute assets provision allows the forfeiture of other
assets *not already forfeitable* when the forfeitable asset is unavailable
due to some act or omission of the defendant.

*See United States v. Bornfield*, 145 F.3d 1123, 1139 (10th Cir. 1998) (em-
phasis added). *See also also* 37 C.J.S. *Forfeitures* § 24 (Westlaw 2009)
("[T]he substituted property is otherwise nonforfeitable property taken in
place of forfeitable property somehow placed outside the court's grasp.").

■ Examining 14 V.I.C. § 606(e) in relation to CICO's other criminal
forfeiture provisions, it is clear that substitute assets become germane
only (1) after conviction, (2) after a special verdict which names the
property subject to forfeiture, *and* (3) after the trial court has determined
that the forfeitable property named in the special verdict is no longer
available to satisfy the forfeiture judgment. By their very nature,
substitute assets are *non*-forfeitable assets, i.e. assets that were not "used
in the course of, intended for use in the course of, derived from, or
realized though" conduct in violation of CICO. Such *non*-forfeitable
assets may be forfeited in place of assets previously deemed forfeitable
only if the trial court finds after conviction that the forfeitable assets are,
for one of the reasons listed in section 606(e), no longer available.
Notably, the express language of section 606(e) comports with such a
conclusion because it permits the trial court to order "forfeiture" not
restraint of substitute assets, and, as previously stated, section 606(c)
authorizes forfeiture only after the defendant has been convicted. *See*
14 V.I.C. § 606(c) ("Any person convicted of conduct constituting a
violation of [CICO] may be required to criminally forfeit . . . any real or
personal property used in the course of . . . conduct in violation of
[CICO] . . . ."). Accordingly, we hold that CICO does not permit pre-trial
restraint of substitute assets.

### 2. The Preliminary Injunction Does Not Order Pre-trial Restraint of Miller's Substitute Assets

Having determined that substitute assets may not be restrained prior to
conviction, we turn now to Miller's argument that $1.3 million in
substitute assets was impermissibly restrained by the preliminary
injunction. Miller contends that the trial judge did not require the People
to trace the allegedly illegal assets and instead ordered pre-trial restraint

of all of his assets, including substitute assets, thereby depriving him of his Sixth Amendment right to counsel of his choice.

 The United States Supreme Court has held that "[w]hatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond the individual's right to spend *his own money* to obtain the advice and assistance of . . . counsel." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626, 109 S. Ct. 2646, 2652, 105 L. Ed. 2d 528 (1989) (internal quotations omitted) (emphasis added). The Supreme Court used the following hypothetical:

> A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense.

*Caplin & Drysdale*, 491 U.S. at 626, 109 S. Ct. at 2652-53.[29] Thus, contrary to the People's contention, citation to *Caplin & Drysdale* does not end our analysis, because the precise argument raised by Miller on appeal is that the preliminary injunction improperly restrains non-forfeitable assets which are his own money and which he seeks to use to pay for his legal defense. Notably, *Caplin & Drysdale* explicitly supports Miller's assertion that he is entitled to use any *non*-forfeitable assets to pay for his attorneys. *See* 491 U.S. at 625, 109 S. Ct. at 2652 ("The forfeiture statute does not prevent a defendant who has nonforfeitable assets from retaining any attorney of his choosing.").

 Miller contends that the trial court erred in failing to require the People to prove how much of the $1.2 million in his PFCU account was obtained lawfully pursuant to employment contracts with the hospital and through other legitimate means, including the sale of homes he purchased

---

[29] In light of *Caplin & Drysdale*'s holding, some states have interpreted their state constitutions more expansively to allow a defendant to use forfeitable funds to pay for their counsel of choice. *See, e.g., Commonwealth v. Hess*, 532 Pa. 607, 617 A.2d 307, 315 (1992). However, as the Sixth Amendment is made applicable to the Virgin Islands by the ROA and as the Virgin Islands has not yet adopted its own constitution, we must adhere to *Caplin & Drysdale*.

prior to 2004. Importantly, "the government is required to trace the seized property directly to the offense giving rise to the forfeiture." *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003). Recognizing that "[t]his can prove difficult when the underlying property is funds that can be deposited in a bank account, withdrawn, and replaced with new, untainted funds, or may be commingled with untainted funds within one account," the Third Circuit Court of Appeals requires "the government to prove *some* nexus to the property involved in the [forfeitable] offense." *Id.* (emphasis in original) (internal quotations omitted). The Third Circuit noted that when tracing illegal funds "that have been commingled with untainted funds, it may be difficult to prove that the funds are property traceable to other funds . . . [d]ifficult, but not necessarily impossible." *Id.* (internal quotations omitted).

Requiring the People to trace illegitimate funds "does not mean, however, that the government had to show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity" or that "no 'untainted' funds were deposited along with the unlawful proceeds." *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992) (*cited in United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir. 1996)). Such a requirement would allow a defendant to defeat the purpose of CICO by commingling legitimate assets with those derived from the alleged CICO violation. *Accord Johnson*, 971 F.2d at 570.

In this case, paragraph 87 of Peru's affidavit, which was attached to the People's petition for a preliminary injunction, avers that over $2.2 million was transferred from the hospital's account at Scotia Bank to Miller's PFCU account during the period of September 21, 2005 to November 2, 2007. (J.A. at 199-200.) Additionally, Peru testified at the preliminary injunction hearing that the alleged CICO violations commenced in 2004. (J.A. at 984.) Since only $1.2 million remained in the PFCU account to which Miller transferred funds from the hospital's account at the time the People sought pre-trial restraint of that account, the People were not required to prove that the remaining $1.2 million was itself part of the $2.2 million that was allegedly transferred in violation of CICO or that Miller had not already spent the illegally obtained funds. *See $8,221,877.16 in U.S. Currency*, 330 F.3d at 159 ("Identical property that is not directly traceable to the offense but is found in the same place or account as the property actually involved in the offense may therefore be

forfeited."). Moreover, it is clear that it is a question for trial whether the $1.3 million Miller characterizes as substitute assets was in fact lawfully derived pursuant to employment contracts or lawful property sales. Part of the People's case, as is illustrated by the Information, is based on whether Miller's receipt of compensation and benefits beyond his standard salary was a violation of CICO. (J.A. at 212, 214-15, 230, 237, 241.) Accordingly, we hold that the preliminary injunction does not impermissibly restrain Miller's non-forfeitable substitute assets.[30]

### F. The Issue as to the Investigator's Allegedly False Testimony is Not Ripe for Review

As his final issue on appeal, Miller argues that Peru falsely testified at the preliminary injunction hearing and in his affidavit that none of the members of the hospital's Compensation Committee knew or approved of certain benefit provisions attached to Miller's employment contracts. As a result, Miller asks this Court to excise the alleged falsehoods from Peru's probable cause affidavit and determine anew whether probable cause is met. In opposition, the People argue that Miller waived this issue by not raising it at the preliminary injunction hearing, or, in the alternative, that we should not excise the statements in the affidavit because the record supports Peru's statements.

■■■ First, the People's assertion that Miller waived this issue is disingenuous. The People do not dispute that Miller sought discovery of the deposition testimonies of the Compensation Committee members but was not provided with the transcripts until after the preliminary injunction

---

[30] We note that when issuing the preliminary injunction the trial judge found probable cause to believe that the assets restrained by the injunction would be forfeitable upon conviction, and the judge also found that any harm which might accrue to Miller from the entry of an injunction would be outweighed by the harm to the People if an injunction was not issued. However, by its express language, section 606(f) provides that a judge may, based upon the information, (1) enter a restraining order or injunction, (2) require execution of a performance bond, or (3) "take any other action including, but not limited to, the appointment of a receiver, *that the Attorney General . . . shows by a preponderance of the evidence is necessary to preserve the reachability of property alleged to be subject to criminal forfeiture.*" 14 V.I.C. § 606(f) (emphasis added).

Although it appears that the trial court may not have made the requisite reachability determination, this issue was not raised on appeal and we do not have the benefit of briefing by the parties on this issue. Moreover, as stated in the next section, Miller's Motion for Dissolution or Modification of the Preliminary Injunction is pending in the trial court at this time.

hearing. Thus, Miller cannot be deemed to have waived this issue for he had no reason to know until receipt of the discovery whether Peru's affidavit misrepresented the Committee members' testimonies. More persuasively, however, the People point out that Miller has raised this very issue in his Motion for Dissolution or Modification of the preliminary injunction, which has not yet been ruled on by the trial court. Accordingly, because it is not currently ripe for review, we decline to address this issue on its merits. *See Harvey v. Christopher*, Civ. No. 2007-115, 2009 WL 331304, at \*3 (V.I. Jan. 22, 2009) ("A textbook example of a matter not ripe for appellate review is an issue that has not yet been ruled on by the trial court.") (citing *Rodrigue v. Rodrigue*, 218 F.3d 432, 443 (5th Cir. 2000)).

## III. CONCLUSION

Because CICO's criminal forfeiture provisions are *in personam* in nature, a Superior Court judge may issue a restraining order or injunction which operates directly upon a defendant who is within the court's jurisdiction and which indirectly affects a defendant's extraterritorial assets. Because the trial court had subject matter jurisdiction at the time it issued the TRO and obtained personal jurisdiction at least as of August 18, 2008, we hold that the *ex parte* TRO is not invalid for lack of jurisdiction. Additionally, because we conclude that the TRO's phrase "*and any other*" is ambiguous under the circumstances of this case, we hold that the trial court abused its discretion in adjudging Miller in civil contempt of court. Furthermore, we hold that the preliminary injunction does not improperly restrain substitute assets. Moreover, we decline to address Miller's argument that Peru's allegedly false testimony must be excised from the record and probable cause reexamined, as the issue is not ripe for review because the trial court has not yet ruled upon Miller's motion for dissolution or modification of the preliminary injunction, which raises that very issue. Finally, because the civil contempt order did not hold Attorneys Grant and Glore in contempt of court, we do not address the issues raised by their appeal from the civil contempt order.

Accordingly, we affirm the validity of the TRO and the preliminary injunction, but we reverse the civil contempt order to the extent that order applies to Miller and dismiss for lack of jurisdiction the appeal filed by Attorneys Grant and Glore from the civil contempt order.